CAMPBELL, Acting Chief Judge,
dissenting.
I respectfully dissent from the decision of my colleagues. Mr. Umlauf challenges his conviction for possession of cocaine on the basis that the trial judge erred in denying his motion to suppress. I agree that the trial judge so erred and would reverse.
Members of the Pinellas County Sheriff’s Narcotics Bureau were preparing to execute a search warrant for the St. Petersburg residence of Frank Saccuci. A SWAT team was to execute the warrant because violence was expected at the residence. Before the warrant could be executed, surveillance teams observed Saccuci leave his residence and drive to a nearby Winn Dixie parking lot. He was alone in his car, and he was driving extremely slowly through the parking lot. He circled the lot and came to a stop, where he remained for about four minutes. He then departed extremely slowly and crossed 38th Avenue to McDonald’s restaurant. Sergeant Diemer testified that “through the information that we had received and through my experience and training that it appeared that Mr. Saccuci was waiting to meet with an individual. And we could only surmise that it was for drugs.”
Saccuci then drove across the street and into a Publix parking lot and threw what was later determined to be cocaine out of his car window. The supervisors on the operation decided to arrest Saccuci in the Publix parking lot. While deputies were taking Saccuci into custody, Detective Lisa Broome, who had remained across the street in the Winn Dixie lot, radioed to Diemer that she was watching an individual, Umlauf, who was acting very nervous.
Detective Broome testified that Umlauf pulled his vehicle up along the building in the firelane. At that very moment, the arrest of Saccuci was in progress across the street and it appeared that Umlauf was watching. Um-lauf pulled up to the end of the building, then pulled back, forward, and back a couple of times, and then all the way back to a phone booth. Since the officers were looking for the person Saccuci appeared to be looking for, Broome thought Umlauf could be that person. Umlauf got out of his car, hurried to the phone and began talking on the phone. He seemed excited and upset. Broome stated she was concerned for the lives and safety of the individuals involved in executing the search warrant. She radioed Diemer, and he returned to the Winn Dixie area to maintain surveillance on Umlauf. When Umlauf started to drive away, Diemer decided to stop him for investigative purposes because of Um-laufs suspicious actions. The officers also wanted to verify that Umlauf had not called Saccuci’s residence because the officers were going there to execute the search warrant. Broome testified that at the time Umlauf was stopped, there was no suspicion that he was • committing or had committed a crime.
The officers yelled at him to get out of the car and put his hands up, which he did. The officers asked him if he had any identification, and Umlauf gave it to them. They then asked him what he was doing there and Umlauf said he was there to pick up his girlfriend. At that point, Umlauf was read his Miranda rights by Diemer and, in my opinion, was unlawfully detained. The officers told him there had been some burglaries in the area and that people had been searched. They asked him if it was all right to search his car and he told them to go ahead. After the officers searched Umlauf s ear and ran a license check, they asked him if it was all right to search him if they gave him his license back. Umlauf said it was not. The officer responded that he had to let them search him for weapons, and Umlauf said, “If you have a right to search me for weapons.” The officer said he was going to. The officer felt Umlauf s pocket that contained a vial of *150 cocaine and asked Umlauf what it was. Um-lauf responded that it was not a weapon. The officer reached in the pocket and pulled out the vial. He then placed Umlauf under arrest.
Diemer testified that he read Umlauf his Miranda rights after Umlauf told him he was waiting for his girlfriend to get off from work at Winn Dixie. Diemer asked Umlauf to accompany him into the Winn Dixie to find his girlfriend. Umlauf declined and then told Diemer he had lied; he was not there to meet his girlfriend; he was there to pay off a debt. Diemer testified that he ordered Um-lauf stopped as he tried to drive away in his car based on information supplied by Broome. Broome, who first observed Um-lauf, testified that no one had any knowledge of any connection between Umlauf and Sac-cud. Broome further testified as follows:
Q. And at that point and time when Mr. Umlauf was stopped by the officers, there was no suspicion that he was committing a crime, or had committed a crime, or was a suspect; is that correct?
A. That’s correct.
Q. There was no indication that you saw, at any time, that he was a physical danger to anyone, that he was carrying a weapon, or anything like that?
A. No, he was not.
Q. And, of course, you really had no idea who he was calling?
A. No.
Q. And he was not part of your — part of your briefing for a be-on-the-look-out for someone who looks like Mr. Umlauf or anything like that?
A.' No.
Q. In fact, it was just the fact that Mr. Saecuci had driven through the parking lot that suddenly gave you the suspicion that he was maybe looking for someone? You didn’t know that he was looking for someone in connection with a drug deal, or in connection with wanting to buy a set of golf clubs? You had no idea what Mr. Saecuci was there for?
A. No.
I conclude that the stop of Umlauf was an unlawful detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Moreover, even if the initial stop had been valid, Umlauf s freedom to leave was clearly restricted without reasonable objective grounds to do so. Lightbourne v. State, 438 So.2d 380 (Fla.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984).
I would reverse.